DCP:EEA
F. #2017R01801

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

BRUCE SNIPAS,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. **1:21-cr-00605(MKB)(PK)**

(T. 18, U.S.C., §§ 371, 982(a)(1),
982(a)(7), 982(b)(1), 1035(a)(1),
1035(a)(2), 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p))

THE GRAND JURY CHARGES:

INTRODUCTION

I.    Background

At all times relevant to this Indictment, unless otherwise indicated:

A.    The Medicare and Medicaid Programs and Private Insurers

1.    The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.   Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.    Medicare was divided into multiple parts.   Medicare Part D provided prescription drug coverage to persons who were Medicare beneficiaries.

3.    The New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate

resources to pay for medical care.   CMS was responsible for overseeing the Medicaid program

in participating states, including New York.   Individuals who received benefits under Medicaid

were similarly referred to as Medicaid "beneficiaries."

4.     In New York State, the Medicaid program provided coverage to its

beneficiaries for prescription drugs.   Medicaid beneficiaries could obtain their prescription drug

benefits from pharmacies either through "fee-for-service" enrollment or through Medicaid

Managed Care plans, which were administered by private health insurance companies ("Private

Insurers") that were paid by Medicaid.

5.     The Private Insurers also provided coverage to individuals who subscribed

to private insurance plans for prescription drug benefits.   Individuals who received benefits

under Private Insurers' plans were similarly referred to as "beneficiaries."

6.     Medicare, Medicaid and Private Insurers each qualified as a "health care

benefit program," as defined by Title 18, United States Code, Section 24(b).

B.     The Pharmacy Benefit Managers

7.     Medicare, Medicaid and Private Insurers did not process their

beneficiaries' prescription claims directly.   Instead, each contracted with pharmacy benefit

managers ("PBMs"), which handled the adjudication of claims to obtain payment for

prescriptions submitted for reimbursement by pharmacies.

8.     The PBMs each qualified as a "health care benefit program," as defined by

Title 18, United States Code, Section 24(b).

9.     A pharmacy could participate in filling Medicare, Medicaid and Private

Insurers beneficiaries' prescriptions by entering into contractual arrangements called "provider

agreements" with one or more PBMs.   The provider agreements incorporated by reference

"provider manuals" and other documents that specified the respective obligations of the PBMs and the pharmacies (collectively, the "Provider Agreement").   The Provider Agreement contained numerous provisions, including but not limited to provisions regarding: (a) the manner and means by which pharmacies were required to submit claims for payment to the PBMs; (b) the method by which the PBMs calculated reimbursement amounts owed to pharmacies; (c) certain parameters for the types of business in which the pharmacies were allowed to engage; (d) the obligation of the pharmacies to collect patient copays; (e) the obligation of the pharmacies to update pharmacy ownership and control information; and (f) the obligation of the pharmacies to comply with applicable federal and state laws and regulations.

10.     In order to enter into a Provider Agreement, a pharmacy had to provide extensive information to a PBM, such as its ownership information, National Provider Identifier ("NPI") number and National Council for Prescription Drug Programs ("NCPDP") number.   An NPI number was a unique 10-digit identification number assigned to health care providers and pharmacies, as mandated by the Health Insurance Portability and Accountability Act of 1996.   A pharmacy's NCPDP number was used to identify licensed pharmacies to insurance companies, health care providers and other entities.   When a pharmacy was purchased by a new owner, CMS required that the new owner apply for a new NCPDP number or seek written permission from NCPDP to continue using the same NCPDP number.   NCPDP numbers were used by CMS and third-party payors, such as PBMs, to verify information about pharmacies, including ownership, location and the type of business conducted by the individual pharmacy, such as retail, mail order or compounding.   Compounding was defined as the combining or mixing of two or more medications to accommodate the medical needs of a particular beneficiary or beneficiary population.   A change in the ownership or type of business a pharmacy conducted

could impact reimbursement decisions of PBMs and other third-party payors if the changes did

not comport with the Provider Agreement or an owner had previously been flagged through an

audit or investigation for submitting fraudulent or improper claims.

11.     A PBM acted on behalf of one or more Private Insurers, Medicare and

Medicaid.   After a beneficiary presented a prescription to a pharmacy and the pharmacy

dispensed the medication, the pharmacy submitted a reimbursement claim to a PBM that

represented the beneficiary's prescription drug plan.   A pharmacy submitted the claim under the

beneficiary's insurance identification number as well as the pharmacy's NPI number.   A PBM

then determined whether the pharmacy was entitled to payment for each claim and periodically

paid the pharmacy for any outstanding claims.   A PBM would send a reimbursement check to a

pharmacy or initiate an electronic transfer of funds to a pharmacy's bank account.   The Private

Insurers, Medicare and Medicaid then reimbursed a PBM for any payments to a pharmacy.

C.     The State Boards of Pharmacy

12.     Each state had a governing body that was charged with oversight of

pharmacies doing business in that particular state.   As a general rule, each state's Board of

Pharmacy required any out-of-state pharmacy shipping filled prescriptions into the state to be

licensed or authorized to do business in that state.   Out-of-state pharmacies had to complete

forms setting forth information regarding ownership and control and past disciplinary sanctions,

among other things, to apply for a license.   Each state's Board of Pharmacy used this

information to determine whether to allow the out-of-state pharmacy to do business in that state.

II.     The Defendant and Relevant Entities

13.     The defendant BRUCE SNIPAS was a licensed pharmacist in the State of

New York from approximately April 1981 to the date of this Indictment.   SNIPAS maintained a

personal savings account at Bank 1, an entity the identity of which is known to the Grand Jury, bearing account number xxxx5004 (the "Snipas Bank 1 Account"), and a personal checking account at Bank 2, an entity the identity of which is known to the Grand Jury, bearing account number xxxx5189 (the "Snipas Bank 2 Account").

14.     Health Care Company, an entity the identity of which is known to the Grand Jury, was a limited liability corporation located in Port St. Lucie, Florida.   Health Care Company was owned by five individuals whose identities are known to the Grand Jury (the "Owners").   In or about and between 2013 and 2019, Health Care Company, its subsidiaries and Owners purchased or controlled numerous pharmacies in states including but not limited to Florida, New York and Tennessee.   Health Care Company maintained a checking account at Bank 3, an entity the identity of which is known to the Grand Jury, bearing account number xxxx7512 (the "Health Care Company Account 1").   Health Care Company maintained a checking account at Bank 2, bearing account number xxxx9918 (the "Health Care Company Account 2").

15.     Limited Liability Company ("LLC-1"), an entity the identity of which is known to the Grand Jury, was a wholly owned subsidiary of Health Care Company.

16.     Florida Pharmacy, an entity the identity of which is known to the Grand Jury, was located in Tampa, Florida and was controlled by an Owner of Health Care Company from approximately 2013 to approximately 2015.

17.     B&E Pharmaceuticals, Inc. ("B&E") was a pharmacy located at 63-52 Woodhaven Boulevard, Rego Park, New York.   The defendant BRUCE SNIPAS incorporated B&E in or about 1988.   B&E was enrolled as an authorized provider in Medicare, Medicaid and various PBMs, and was authorized to bill Medicare and Medicaid for drugs it dispensed to

beneficiaries.   B&E also billed Private Insurers for drugs dispensed to beneficiaries through

PBMs.   B&E maintained two business checking accounts at Bank 2: one bearing account

number xxxx7787 (the "B&E Account 1") and one bearing account number xxxx0355 (the

"B&E Account 2") (collectively, the "B&E Accounts").   SNIPAS was the sole signatory on the

B&E Accounts until on or about November 9, 2016, at which point three of the Owners of

Health Care Company were added as signatories on the B&E Accounts.   Beginning in

approximately April 2015, Health Care Company controlled the business and operations of B&E,

though B&E was legally owned by SNIPAS until in or about September 2016.   In September

2016, Health Care Company officially purchased B&E, but SNIPAS continued to purport to be

the owner of B&E following that purchase.

18.     Straw Pharmacy, an entity the identity of which is known to the Grand

Jury, was located in Brooklyn, New York.   On or about November 11, 2016, the defendant

BRUCE SNIPAS purported to purchase Straw Pharmacy, though Health Care Company

provided the funds for the purchase and controlled Straw Pharmacy's business and operations.

19.     Marketing Company 1 and Marketing Company 2 (collectively, the

"Marketing Companies"), entities the identity of which are known to the Grand Jury, were

corporations organized under the laws of the State of Florida, which purchased personal

healthcare information of beneficiaries from third party companies and sold that information to

Health Care Company.

20.     PBM 1, an entity the identity of which is known to the Grand Jury, was a

PBM headquartered in Woonsocket, Rhode Island, which had a Provider Agreement with B&E

from approximately October 1989 to approximately April 2017.

21.     PBM 2, the identity of which is known to the Grand Jury, was a PBM headquartered in Louisville, Kentucky, which had a Provider Agreement with B&E from approximately January 2013 to approximately April 2018.

III.     The Fraudulent Scheme

22.     In or about and between April 2015 and January 2018, the defendant BRUCE SNIPAS, together with others, agreed to receive kickbacks to facilitate Health Care Company's submission of false claims to Medicare, Medicaid and Private Insurers on behalf of B&E.   Specifically, in exchange for kickbacks from Health Care Company and its Owners, SNIPAS misrepresented to Medicaid, PBM 1, PBM 2 and the boards of pharmacy for the States of New York, New Jersey, South Dakota, Iowa and Florida, among other states, that he was the sole owner of B&E, that he would not ship prescription medications to other states without prior authorization and that he believed the medications that B&E was filling were prescribed after a physical examination of a beneficiary.   These misrepresentations were intended to induce Medicaid, PBM 1, PBM 2 and the state boards of pharmacy to allow SNIPAS and Health Care Company to dispense pharmaceutical drugs and receive reimbursements that they were not entitled to receive.

A.     The Sham Agreement and the Sale of B&E to Health Care Company

23.     In early 2015, the defendant BRUCE SNIPAS met with the Owners of Health Care Company, who offered to purchase B&E for $600,000, well above the market value for B&E.   To conceal Healthcare Company's filling of fraudulent prescriptions through B&E and its financial control of B&E's business operations, Health Care Company requested that SNIPAS stay on as the purported owner of B&E and as the pharmacist-in-charge.   A pharmacist-in-charge ("PIC") was a licensed pharmacist in good standing with the governing

state's Board of Pharmacy, who accepted responsibility for a pharmacy's day-to-day operations, certified the pharmacy's compliance with applicable laws and regulations and oversaw all pharmacy personnel.

24.     In or about April 2015, prior to the actual sale of B&E shares to Health Care Company, the defendant BRUCE SNIPAS and the Owners of Health Care Company entered into a written agreement that was designed to make it appear as though Health Care Company would provide management and marketing services to B&E in exchange for a management fee (the "MSA").   In fact, the MSA was a sham and Health Care Company never intended to supply the services contemplated thereunder.   Instead, Health Care Company paid SNIPAS kickbacks to fill prescriptions supplied to B&E by Health Care Company using B&E's NCPDP number and PBM contractual relationships, and to obtain reimbursements from Medicare, Medicaid and Private Insurers that B&E and Health Care Company were not entitled to obtain.

25.     On or about September 20, 2016, the defendant BRUCE SNIPAS purported to sell his stock interest in B&E, consisting of 200 shares, to Health Care Company for $600,000.   The transaction was a sham designed to make it appear as though B&E had previously been independent of Health Care Company, even though Health Care Company already had a de facto controlling stake in B&E since approximately April 2015.

B.     Operation of B&E by Health Care Company

26.     As part of the scheme, Health Care Company steered thousands of fraudulent mail order prescriptions to B&E, and B&E shipped prescription drugs across the country on behalf of Health Care Company and its Owners.   Under Health Care Company's

operation, B&E sought and received over $30 million in reimbursements from Medicare, Medicaid and Private Insurers.

27.     After the execution of the MSA, many of the new prescriptions that were generated by Health Care Company and filled by B&E were for expensive topical pain creams (the "Pain Creams") that were not originally prescribed by doctors.   Instead, Health Care Company generated a large volume of prescriptions by unlawfully purchasing beneficiaries' prescription information from the Marketing Companies.   To verify the beneficiaries' purchased health information, employees of the Marketing Companies, masquerading as healthcare professionals, called beneficiaries and verified beneficiaries' information.   Health Care Company used that information to repeatedly send pre-filled prescription forms to the beneficiaries' doctors for signature as well as make telephone calls to doctors' offices for verbal prescription authorizations, often obtained from staff employed at the doctors' offices.   This generated thousands of prescriptions from doctors who never intended to prescribe the expensive and often unnecessary Pain Creams, as the doctors had not examined the beneficiaries to determine the medical necessity of the Pain Creams.   Health Care Company then electronically sent the prescriptions to B&E to be filled.

28.     The defendant BRUCE SNIPAS provided Health Care Company with B&E's account billing information including its NPI and NCPDP numbers.   This allowed Health Care Company to submit reimbursement claims in B&E's name for the mail order prescriptions to PBMs for payment on behalf of Medicare, Medicaid and Private Insurers.   The PBMs then deposited the reimbursements into B&E Account 1.

29.     To further the scheme and to ensure reimbursement by the PBMs, the defendant BRUCE SNIPAS signed documents that were submitted to Medicaid, the state boards

of pharmacy for New York, New Jersey, South Dakota, Iowa and Florida, among others, PBM 1 and PBM 2, containing material misrepresentations, including that SNIPAS was B&E's sole proprietor and owner when in fact Health Care Company controlled all of the mail order business and revenue generated at B&E after Health Care Company entered into the sham MSA with B&E in April 2015.   In this way, the PBMs, Medicaid and the state boards of pharmacy believed they were doing business with B&E and SNIPAS but were in fact doing business primarily with Health Care Company and its Owners.

30.     Concealing the involvement of Health Care Company from the PBMs, Medicaid and the state boards of pharmacy was important to the scheme because the Owners of Health Care Company owned other pharmacies across the country that were the subject of audits due to a large amounts of fraudulent mail order prescriptions.   For example, one of the Owners of Health Care Company previously owned and controlled the Florida Pharmacy from approximately 2013 to approximately 2015.   PBM 1 had a Provider Agreement with the Florida Pharmacy.   PBM 1 conducted an audit of the Florida Pharmacy in approximately July 2014 after it noticed a dramatic increase in claims presented by the Florida Pharmacy.   During the audit, PBM 1 found numerous violations of its Provider Agreement and fraudulent prescriptions, resulting in an overpayment amount of approximately $266,800 to the Florida Pharmacy.   As a result of the audit findings, PBM 1 terminated its Provider Agreement with Florida Pharmacy in early 2015.

C.      The Kickbacks Paid to the Defendant

31.     Throughout the scheme, after the PBMs paid B&E for the Health Care Company-referred prescriptions, the defendant BRUCE SNIPAS transferred money from B&E bank accounts to accounts for Health Care Company.   From approximately June 2015 to

approximately September 2016, SNIPAS transferred approximately $30,387,413.06 from B&E

accounts to Health Care Company Account 1.   From approximately June 2016 to approximately

April 2017, Health Care Company paid kickbacks to SNIPAS totaling approximately $650,000.

32.     For example, in June 2016, the defendant BRUCE SNIPAS sent

approximately $4 million from B&E Account 1 to the Health Care Company Account 1.   That

same month, Health Care Company sent SNIPAS $200,000.   The large kickback payments to

SNIPAS continued thereafter, and on or about December 8, 2016, SNIPAS received $50,000 into

Snipas Bank 1 Account from B&E Account 2 as a kickback.   Just seven days later, on or about

December 15, 2016, SNIPAS received approximately $100,000 into Snipas Bank 1 Account

from B&E Account 2 as a kickback.   The payments to SNIPAS took place both before and after

the sham sale of B&E to Health Care company.   The payments to SNIPAS were not made

pursuant to the MSA and functioned as kickbacks for allowing Health Care Company to use

B&E's NCPDP number to submit millions of dollars in claims to PBMs.

D.     The Defendant's Repeated Misrepresentations Regarding the Ownership of B&E

33.     In approximately June 2015, the defendant BRUCE SNIPAS, at the

direction of Health Care Company, began compounding the Pain Creams in B&E's unfinished

and unsanitary basement as a way to increase Health Care Company's profits.   In approximately

December 2015, a representative of PBM 1 visited B&E and discovered the Pain Cream

compounding area in the basement.   During that visit, SNIPAS told the PBM 1 representative

that he decided to compound drugs to generate more revenue but did not divulge that it was at

the direction of Health Care Company or his business arrangement with Health Care Company.

PBM 1 commenced an audit of B&E as a result of this visit.

34.     Following the December 2015 visit from PBM 1, the defendant BRUCE

SNIPAS continued to represent to PBMs and federal health care programs that he was the sole

individual with ownership interest and managerial control over B&E, though Health Care

Company controlled the business operations of B&E, received the majority of B&E's revenue

and steered mail order prescriptions to B&E.

35.     For example, on or about June 22, 2016, the defendant BRUCE SNIPAS

signed a Medicaid Enrollment Renewal Application on behalf of B&E and failed to list Health

Care Company and its Owners as having an ownership interest or managerial control in B&E.

SNIPAS further attested that no change in ownership of B&E was contemplated in the next 12

months.

36.     On or about September 20, 2016, SNIPAS signed a stock purchase

agreement, selling the stock of B&E to LLC-1, a wholly owned subsidiary of Health Care

Company, though Health Care Company already controlled B&E and received a majority of its

revenue.

37.     On or about November 16, 2016, the defendant BRUCE SNIPAS

submitted a change of prescription department manager application to the Florida State Board of

Pharmacy on behalf of B&E as the owner and failed to disclose Health Care Company and its

Owners as the sole owners of B&E.

38.     On or about December 7, 2016, the defendant BRUCE SNIPAS signed an

attestation and amendment to B&E's Pharmacy Provider Agreement with PBM 2, which

instructed that any pharmacy doing business with PBM 2 could not ship any prescription drugs

through the mail and that doing so would be grounds for immediate termination from the PBM 2.

SNIPAS signed the attestation as owner of B&E, though he had sold all of his shares in B&E to LLC-1 approximately three months earlier.

39.     On or about January 26, 2018, approximately 16 months after he purported to sell all of his shares in B&E to LLC-1, the defendant BRUCE SNIPAS signed a change of prescription department manager application for the Florida State Board of Pharmacy as "owner/outgoing PIC" of B&E.

40.     On or about February 13, 2018, approximately 17 months after he purported to sell all of his shares in B&E to LLC-1, the defendant BRUCE SNIPAS signed an affidavit with the South Dakota Board of Pharmacy indicating that he was the owner of B&E.

E.     Complaints about B&E and the Purchase of the Straw Pharmacy

41.     In approximately January 2016, various state boards of pharmacies began receiving complaints from beneficiaries and physicians about Health Care Company and B&E shipping the expensive Pain Creams, which beneficiaries did not ask for and physicians did not prescribe.   Around the same time, the PBMs began to terminate their respective contracts with B&E after determining that B&E was violating the respective Provider Agreements by shipping prescription drugs out of state, compounding drugs and submitting claims for reimbursement for Pain Creams that physicians had not prescribed and beneficiaries had not requested.

42.     Due to the numerous complaints that the state boards of pharmacy and PBMs received about B&E's fraudulently obtained Pain Cream prescriptions, and in order to continue the scheme, Health Care Company and its Owners needed the NPI and NCPDP numbers of a new pharmacy to continue to bill Medicaid, Medicare and Private Insurers for the fraudulently obtained prescriptions.

43.     In approximately November 2016, the defendant BRUCE SNIPAS agreed to act as a straw buyer to purchase the Straw Pharmacy on behalf of Health Care Company so that Health Care Company could continue its fraudulent scheme.   Although SNIPAS was ostensibly acting as a purchaser of the Straw Pharmacy, Health Care Company supplied the funds to purchase the Straw Pharmacy.   SNIPAS assisted Health Care Company and its Owners in concealing their financial interest in the Straw Pharmacy from the PBMs, because disclosure of Health Care Company's financial interest in the Straw Pharmacy would jeopardize the PBMs making payment for claims submitted, as Health Care Company already had ownership interests in other pharmacies that were billing extraordinarily high amounts of mail order prescriptions that had prompted audits by PBMs.   PBMs required transparency regarding pharmacy ownership to enable the PBMs to make accurate assessments regarding payment of claims submitted by the pharmacies.

44.     On or about November 16, 2016, in furtherance of the scheme, the defendant BRUCE SNIPAS signed a non-resident Iowa Board of Pharmacy application seeking to have the Straw Pharmacy provide mail order prescriptions to beneficiaries in Iowa and purporting to be the owner of the Straw Pharmacy.

<u>COUNT ONE</u>
(Conspiracy to Make False Statements in Health Care Matters)

45.     The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

46.     In or about and between April 2015 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRUCE SNIPAS, together with others, did knowingly and willfully conspire, in a matter involving a health care benefit program, to wit: Medicaid, Private Insurers and PBMs, to (a)

falsify, conceal and cover up by trick, scheme and device material facts; and (b) make one or more materially false, fictitious and fraudulent statements and representations, and make and use one or more materially false writings and documents knowing the same to contain one or more materially false, fictitious and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items and services, in that SNIPAS falsely represented in applications to Medicaid, state boards of pharmacy and PBMs that he was the sole owner of B&E, and the sole owner of Straw Pharmacy, contrary to Title 18, United States Code, Section 1035(a).

47.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant BRUCE SNIPAS, together with others, did commit and cause the commission of, among others, at least one of the following:

OVERT ACTS

(a)     On or about February 2, 2016, SNIPAS signed a pharmacy audit acknowledgement for PBM 1 on behalf of B&E and failed to list Health Care Company and its Owners as having a controlling interest in B&E.

(b)     On or about June 22, 2016, SNIPAS signed a Medicaid enrollment renewal application on behalf of B&E and failed to list Health Care Company and its Owners as having a controlling interest in B&E.

(b)     On or about November 11, 2016, SNIPAS attended a meeting in which he signed documents purporting to be the purchaser of the Straw Pharmacy.

(c)     On or about November 16, 2016, SNIPAS signed a non-resident Iowa Board of Pharmacy application seeking to have Straw Pharmacy provide mail order prescriptions to beneficiaries in Iowa and purporting to be the owner of Straw Pharmacy.

(d)      On or about November 16, 2016, SNIPAS submitted a change of prescription department manager application to the Florida State Board of Pharmacy on behalf of B&E and failed to disclose Health Care Company and its Owners as the owners of B&E.

(e)      On or about December 7, 2016, SNIPAS signed an attestation and amendment to a Pharmacy Provider Agreement with PBM 2, which instructed that any pharmacy doing business with PBM 2 could not ship any prescription drugs through the mail and that doing so would be grounds for immediate termination from the PBM 2.

(f)      On or about January 26, 2018, SNIPAS signed a change of prescription department manager application for the Florida State Board of Pharmacy as "owner/outgoing PIC" of B&E.

(g)      On or about February 13, 2018, SNIPAS signed an affidavit with the South Dakota Board of Pharmacy indicating that he was the owner of B&E.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(False Statements Made in Health Care Matters)

48.      The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

49.      In or about and between April 2015 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRUCE SNIPAS, together with others, in a matter involving one or more health care benefit programs, to wit: New York Medicaid, PBM 1 and PBM 2, did knowingly and willfully (a) falsify, conceal and cover up by trick, scheme and device material facts; and (b) make one or more materially false, fictitious and fraudulent statements and representations, and make and use one or more materially false writings and documents knowing the same to contain one or more

materially false, fictitious and fraudulent statements and entries, in connection with the delivery

of and payment for health care benefits, items and services, in that SNIPAS falsely represented

in applications to New York Medicaid, PBM 1 and PBM 2 that he was the sole owner of B&E

and no ownership change was anticipated, and he was not shipping prescription drugs through

the mail, contrary to Title 18, United States Code, Section 1035(a).

(Title 18, United States Code, Sections 1035(a)(1), 1035(a)(2), 2 and 3551 et seq.)

COUNT THREE
(Conspiracy to Violate the Anti-Kickback Statute)

50.     The allegations contained in paragraphs one through 44 are realleged and

incorporated as if fully set forth in this paragraph.

51.     In or about and between April 2015 and February 2018, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant

BRUCE SNIPAS, together with others, did knowingly and willfully conspire to solicit and

receive kickbacks, directly and indirectly, overtly and covertly, in cash and in kind, in return for

purchasing, leasing, ordering and arranging for and recommending purchasing, leasing and

ordering any good, facility, service and item for which payment may have been made in whole

and in part under one or more federal health care programs, as defined in Title 18, United States

Code, Section 24(b), to wit: Medicare, Medicaid and private insurers, contrary to Title 42,

United States Code, Section 1320a-7b(b)(2)(B).

52.     In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendant BRUCE SNIPAS, together with

others, did commit and cause the commission of, among others, at least one of the following:

## OVERT ACTS

(a)      On or about April 1, 2015, SNIPAS entered into a MSA with Health Care Company, in which the parties agreed that Health Care Company would receive a fixed management service fee of $120,000 plus variable fees for marketing and other services it performed on behalf of B&E.

(b)      On or about August 11, 2015, SNIPAS sent $61,907.58 from B&E Account 1 to Health Care Company Account 1.

(c)      On or about August 11, 2015, SNIPAS received $20,000 into B&E Account 2, from the Health Care Company Account 1.

(d)      On or about October 6, 2015, SNIPAS sent $100,000 from B&E Account 1 to the Health Care Company Account 1.

(e)      On or about October 29, 2015, SNIPAS received $20,000 into B&E Account 2, from Health Care Company Account 1.

(f)      On or about November 27, 2015, SNIPAS received $25,000 into B&E Account 2, from Health Care Company Account 1.

(g)      On or about January 29, 2016, SNIPAS received $25,000 into B&E Account 2, from Health Care Company Account 1.

(h)      On or about September 20, 2016, SNIPAS signed a stock purchase agreement, selling the stock of B&E to LLC-1.

(i)      On or about October 31, 2016, SNIPAS received $100,000 into B&E Account 2, from Health Care Company Account 2.

(j)      On or about November 1, 2016, SNIPAS received $100,000 into Snipas Bank 2 Account from B&E Account 2.

(k)      On or about December 8, 2016, SNIPAS received $100,000 into Snipas Bank 1 Account from B&E Account 2.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH THREE

53.      The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts One through Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offenses.

54.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)      cannot be located upon the exercise of due diligence;

      (b)      has been transferred or sold to, or deposited with, a third party;

      (c)      has been placed beyond the jurisdiction of the court;

      (d)      has been substantially diminished in value; or

      (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(7) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2017R01801

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

BRUCE SNIPAS,

Defendant.

# INDICTMENT

(T. 18, U.S.C., §§ 371, 982(a)(1), 982(a)(7), 982(b)(1), 1035(a)(1), 1035(a)(2), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p))

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day, of* _____ *A.D. 20* ____

_____
*Clerk*

*Bail, $* _____

***Erin E. Argo, Assistant U.S. Attorney (631) 715-7846***

21