

U.S. Department of Justice

United States Attorney
Eastern District of New York

JPL:JV  
F. #2017R01801

271 Cadman Plaza East
Brooklyn, New York 11201

March 18, 2024

By ECF

The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re: United States v. Bruce Snipas,
       Criminal Docket No. 21-605 (MKB)

Dear Chief Judge Brodie:

  The government respectfully submits this letter in advance of the defendant Bruce Snipas' sentencing, which is scheduled for Tuesday, March 26, 2024, at 10:30 a.m. On October 18, 2022, the defendant pleaded guilty to Count Three of an indictment charging him with Conspiracy to Violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), in violation of 18 U.S.C. § 371. See ECF Dkt. Entry dated October 18, 2022 (Minute Entry for Change of Plea Hearing).

  The defendant accepted over a half million dollars in kickbacks in exchange for concealing the sale, ownership and control of his pharmacy and the true ownership and control of a second pharmacy from Medicare, Medicaid, private insurers and multiple state boards of pharmacies for over three years. See Presentence Investigation Report dated February 22, 2023 (the "PSR") ¶¶ 18-29, 31-33. As a result of the defendant's concealment of the true ownership and control of the pharmacies, the defendant's co-conspirators were able to avoid detection and submit thousands of fraudulent prescriptions and receive over $30 million in reimbursements from Medicare, Medicaid and private insurers. Id. ¶ 22.

  Considering the deliberate, repeated and extended nature of the defendant's offenses and the seriousness of the consequent offenses and harms caused to the vital Medicare and Medicaid programs, as well as to private insurers, the government respectfully requests that the Court impose a sentence at the top of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 24 to 30 months' imprisonment. The government also respectfully requests that the Court enter a final order of forfeiture in the amount of $671,907.58.

I.      Background and Criminal Conduct

As charged in the Indictment and as outlined in the PSR, the defendant was a New York State licensed pharmacist and the owner of B&E Pharmaceuticals, a Rego Park, New York pharmacy ("B&E"). ECF No. 1 (Indictment) ¶¶ 13, 17; PSR ¶¶ 12, 14. B&E was enrolled with Medicare, Medicaid, multiple pharmacy benefit managers and private insurers. PSR ¶ 14.

In or about April 2015, the defendant sold B&E to Company-1, a Florida corporation, for $600,000, a price well above the company's market value. Id. ¶¶ 14, 19. At Company-1's request, the defendant stayed on as B&E's purported owner. Id. ¶ 19. Company-1 paid the defendant kickbacks to hold himself out as B&E's sole owner and to fill prescriptions supplied to B&E by Company-1 using B&E's contractual relationships and registration numbers. Id. ¶ 20.

With B&E's true ownership and control concealed, Company-1 steered thousands of fraudulent mail order prescriptions to B&E and B&E in turn shipped prescription drugs across the country on behalf of Company-1. Id. ¶ 22. Under Company-1's operations, B&E sought and received over $30 million in reimbursements from Medicare, Medicaid and private insurers. Id. Many of the prescriptions generated by Company-1 and filled by B&E were for expensive topical pain creams that were not originally prescribed by physicians. Id. ¶ 23. Rather, Company-1 generated the prescriptions by: (1) unlawfully purchasing beneficiaries' prescription information from marketing companies; (2) verifying the beneficiaries' information by masquerading as health care professionals; (3) sending pre-filled prescription forms to the beneficiaries' physicians for signature despite a lack of medical necessity or a medical exam; and (4) electronically forwarding the prescriptions to B&E to be filled and billed. Id. ¶ 23.

In furtherance of that scheme, the defendant signed documents submitted to Medicaid, state boards of pharmacies and private insurers misrepresenting that the defendant was B&E's sole proprietor and owner. Id. ¶ 25. By doing so, these entities believed they were still doing business with B&E and the defendant, instead of with Company-1 and its owners. Id. The defendant, Company-1 and its owners concealed B&E's new ownership and control because Company-1's owners were the subject of multiple audits nationwide for large amounts of fraudulent prescriptions, and Medicare, Medicaid, the state board and private insurers would have audited or terminated their relationship with, and reimbursements to, B&E if they had known of B&E's true ownership and control. Id.

Throughout the scheme, the defendant transferred money from B&E's bank accounts to Company-1's accounts and received kickbacks in return. Id. ¶ 26. In addition to the above-market purchase price for B&E, Company-1 paid the defendant at least $590,000 in kickbacks from June 2016 to April 2017 alone. Id. ¶¶ 25, 32.

Moreover, in November 2016, the defendant agreed to act as a straw buyer to purchase New York City Pharmacy, a Brooklyn pharmacy doing business as Mom Pharmacy ("Mom Pharmacy") on behalf of Company-1, so that Company-1 could continue its fraudulent scheme. Id. ¶ 31. In connection with that purchase, the defendant attended meetings and signed applications purporting to be the true purchaser of Mom Pharmacy. Id.

II.     Procedural History

In or about early 2017, the government approached the defendant concerning his involvement in a health care fraud conspiracy. The defendant voluntarily spoke to the government pursuant to written proffer agreements on at least nine occasions from February 2017 through January 2022. In addition to these meetings, his counsel spoke to the government on multiple occasions. The defendant also provided certain e-mails and business records. Despite the proffers and voluntary productions, however, the government did not believe that the defendant was being entirely forthright. Ultimately, the government did not rely on the information provided by the defendant and has no plans to do so.

On December 1, 2021, a grand jury in this district returned an indictment charging the defendant with Conspiracy to Make False Statements in Health Care Matters in violation of 18 U.S.C. § 371 (Count One); False Statements Made in Health Care Matters in violation of 18 U.S.C. §§ 1035(a)(1) and (a)(2) (Count Two); and Conspiracy to Violate the Anti-Kickback Statute in violation of 18 U.S.C. § 371 (Count Three). ECF Dkt. No. 1 (the "Indictment").

On December 7, 2021, the defendant was arrested on the Indictment. See ECF Dkt. Entry dated Dec. 7, 2021 (Minute Entry). The defendant was arraigned and released on bond that same day. Id.

On October 18, 2022, the defendant pleaded guilty, pursuant to a plea agreement, to Count Three of the Indictment and the Court accepted the defendant's guilty plea. ECF Dkt. Entry dated October 18, 2022.

III.    The Defendant's Guidelines Range

   A.     Offense Level Calculation

The government respectfully accepts Probation's calculation of the total offense level as set forth below:

| | |
|---|---:|
| Base Offense Level (§§ 2X1.1(a), 2B1.1(a)(2)) | 6 |
| Plus: Loss Above $550,000 (§ 2B1.1(b)(1)(H)) | +14 |
| Plus: Abuse of Trust or Use of Special Skill (§ 3B1.3) | +2 |
| Adjustment for Certain Zero-Point Offenders (§ 4C1.1) | -2 |
| Total: | 20 |

PSR ¶¶ 40-45; Addendum to the Presentence Report dated March 14, 2024 ("PSR Add.") at 1.

As the defendant has accepted responsibility for the offense and notified the government in a timely manner of his intent to enter a plea of guilty, the offense level is decreased three levels, resulting in a Total Offense Level of 17. PSR ¶¶ 41-43; PSR Add. at 1.

The defendant argues that he should receive a minor role adjustment pursuant to U.S.S.G. § 3B1.2(b). But the defendant did not have a minor role—he was one of the key participants in the scheme by receiving the kickbacks and concealing Company-1's involvement from the victims. Without the defendant, there would have been no kickbacks, no pharmacy to

3

funnel prescriptions through and no concealment of Company-1's involvement. Moreover, the defendant had a more active role than a mere straw owner—he actively lied to Medicare, Medicaid, private insurers and state boards of pharmacies, and he received, filled and mailed out thousands of prescriptions for expensive topical pain creams that were not medically necessary or prescribed by a medical professional after a health care exam. Accordingly, as set forth in the Addendum to the PSR, the defendant's "actions overall are not consistent with a minor role adjustment." PSR Add. at 1.

  B.  Criminal History Calculation

  The government respectfully submits that Probation's calculation of the defendant's criminal history category of I is also correct. Id. ¶ 52.

  C.  Applicable Guidelines Range

  Based on a Total Offense Level of 17 and a criminal history category of I, the Guidelines' imprisonment range is 24 to 30 months' imprisonment. PSR Add. at 1. The Guidelines' range for supervised release is one to three years. PSR ¶ 86. Since the applicable Guidelines range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. Id. ¶ 88 (citing U.S.S.G. § 5B1.1, comment n.2).

  The Guidelines' range for a fine is from $10,000 to $100,000. Id. ¶ 91 (citing U.S.S.G. § 5E1.2(c)(3)). The maximum fine is $250,000. Id. ¶ 89 (citing 18 U.S.C. § 3571(b)).

  As per the plea agreement, the defendant has consented to the entry of a forfeiture money judgment in the amount of $671,907.58. Id. ¶ 95.

IV.  A Significant Sentence of Incarceration Is Appropriate

  A.  Legal Standard

  In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

  Subsequently, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation

4

omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

B.   Application of Law

The government respectfully requests that the Court impose a term of imprisonment because such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). Specifically, the circumstances in this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment and the need for specific and general deterrence warrant a custodial sentence at the top of the advisory Guidelines range of 24 to 30 months.

1.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Warrant a Substantial Sentence

A custodial sentence at the top of the Guidelines range is appropriate considering the nature and circumstances of this offense. The defendant's conduct is serious. The defendant accepted kickbacks for approximately three years in exchange for a deliberate and sustained series of lies to Medicare, Medicaid, private insurers and state boards of pharmacies. By concealing Company-1's ownership and control of B&E, he allowed Company-1 to perpetrate a massive fraudulent scheme of fraudulent prescriptions and billing. Moreover, after accepting the kickbacks and concealing their role, he doubled-down on his conduct by agreeing to act as the straw purchaser for a second pharmacy. Without the defendant's kickbacks and concealment, Medicare, Medicaid, private insurers and state boards of pharmacies would have stepped in to audit and terminate Company-1's contracts and licenses.

The defendant's conduct also constitutes a serious breach of the trust that the American public placed in him as a pharmacist and a provider in the Medicare program. The Medicare program is an entirely "trust-based system," meaning that "Medicare does not verify that procedures were actually performed by, for example, cross-referencing claims with medical records, but rather it relies on the representations of the medical professionals that each claim submitted was performed as billed." See United States v. Ahmed, No. 14-CR-277 (DLI), 2017 WL 3149336, at *2 (E.D.N.Y. July 25, 2017). Thus, to accomplish its criminal objectives, Company-1 paid the defendant to betray the trust the Medicare and Medicaid programs, as well as the public, place in health care professionals, both to use their judgment to help patients and to

5

act as responsible stewards of the money our society places at their disposal to provide that help. The defendant broke that trust by accepting kickbacks to conceal Company-1 at the taxpayers' expense.

The defendant's repeated decisions to accept the kickbacks and conceal Company-1's crimes were deliberate and calculated, and not momentary lapses of judgment. He filled thousands of fraudulent prescriptions, transferred millions of dollars to Company-1, accepted hundreds of thousands of dollars in kickbacks and concealed Company-1's involvement with impunity for years.

Nothing about the defendant's history or personal circumstances distinguishes him from many perpetrators of a significant financial crime. While the government does not dispute that the defendant was a good provider to his now adult children and is an active member of his community, those ties do not outweigh the other sentencing considerations. Simply put, this was not a crime of need. Nor was it a crime resulting from events thrust upon him by outside forces. To the contrary, it was a calculated crime of choice. Instead of making money honestly, the defendant accepted hundreds of thousands of dollars to conceal a multi-million dollar fraud.

Contrary to the defense's arguments, the defendant was not "a minor actor in the conspiracy." As an initial matter, he was a key actor in the kickback conspiracy—the recipient of the payments. If he had not accepted the kickbacks, there simply would be no conspiracy to accept kickbacks. Moreover, beyond the kickback conspiracy, the defendant did not play a minor role in the larger health care fraud conspiracy. The defendant did not act as an owner in name only and without further involvement. Instead, he lied to multiple entities—Medicare, Medicaid, private insurers and state boards of pharmacy. He signed and submitted multiple documents misrepresenting the ownership and control of B&E. He received, filled and mailed out thousands of prescriptions for expensive topical pain creams that were not medically necessary and had not been prescribed after an exam by a health care professional. He transferred millions of dollars in fraudulently-obtained reimbursements from B&E's bank accounts to Company-1's bank accounts. And then, he agreed to act as a straw owner and do it all over again at Mom Pharmacy. That active and sustained involvement in the offense is not minor and warrants a term of incarceration.

2. A Custodial Sentence Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law and Provides Just Punishment

The defendant's decision to accept the kickbacks and conceal the scheme from authorities for multiple years shows a lack of respect for the law. These considerations weigh in favor of a substantial sentence that would convey the seriousness of his decision to put his financial interests ahead of the public trust by helping to exploit Medicare, Medicaid and private insurers.

Fraud against Medicare and Medicaid alone is a serious offense that targets national programs relied on by millions of Americans. Congress aptly summarized the effects of health care fraud over forty-five years ago:

6

> In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. 95-393, pt. II, at 44 (1977); see also H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures."). These concerns are just as pressing today as they were then, which is why Congress has enacted increasingly severe penalties for health care fraud, most recently directing the Sentencing Commission to add enhancements for defendants who commit the most financially serious health care frauds. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §10606(a)(2)(C), 124 Stat. 119, 1007 (2010) (directing Sentencing Commission to amend guidelines in order to punish health care fraud more severely).

The defendant accepted kickbacks for years to hide a long-running scheme to submit false and fraudulent claims for prescription medications that were not medically necessary and had not been prescribed after a legitimate medical examination. His involvement allowed Company-1 to avoid detection and perpetrate the scheme for years. A custodial sentence is required to reflect the seriousness of the defendant's conduct, to promote respect for the law and to adequately punish the defendant for his involvement.

        3.        <u>A Substantial Sentence Affords Deterrence and Protects the Public</u>

The Court's sentence should also further the aims of specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B), (C).

Although this is the defendant's first criminal conviction, his conduct was not a single failure of judgment or momentary ethical lapse. As described above, the defendant's conduct involved repeated, deliberate decisions.

A Guidelines sentence is necessary to deter not only the defendant, but also similarly-situated individuals from engaging in fraudulent behavior. Fraud schemes like the one perpetrated in this case threaten the integrity of the Medicare and Medicaid programs. Because the profits of these schemes are often enormous — the only limiting variables are the criminals' ability to manufacture Medicare and Medicaid claims and their likelihood of getting caught — it is critical to address the problem through systematic deterrence.

Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted). As Judge Garaufis has recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018); see also; United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is

7

"of central concern to Congress"). This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." See Johnson, 2018 WL 1997975 at *5 (internal quotation marks omitted); see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). This is especially true when the potential rewards for would-be criminals who are not caught can be substantial.

The need to promote general deterrence is particularly acute in cases where, like in the defendant's case, government insurance programs are among the victims. Fraud against Medicare, Medicaid and other public insurance programs diverts scarce resources from the people those programs are designed to serve – the patients and beneficiaries – into the pockets of those who lie and cheat. The defendant's sentence should take into account the need to deter other people who may be tempted to commit similar crimes from enriching themselves at the expense of the public.

V.     Forfeiture

The defendant has agreed to pay $671,907.58 in forfeiture, representing the proceeds of his offense. Plea Agreement dated October 18, 2022, ¶ 6. Accordingly, the government respectfully requests that the Court issue the final forfeiture order and incorporate the order into the judgment of conviction.

VI.    Conclusion

For the foregoing reasons and based on a balancing of the Section 3553(a) factors, the Court should impose a sentence of imprisonment at the top of the advisory Guidelines range of 24 to 30 months' imprisonment, as well as enter a final forfeiture money judgment in the amount of $671,907.58.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

By:   /s/ *John Vagelatos*
John Vagelatos
Assistant U.S. Attorney

cc:    Clerk of the Court (MKB) (via ECF and email)
       Thomas F. X. Dunn, Esq. (via ECF and email)
       Probation Officer Frank Nikolaidis (via ECF and email)

8